UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

    Case No. 1:22-cr-16

    Hon. Hala Y. Jarbou

DANIEL CASTRO, M.D.,

    Defendant.
_____/

## OPINION

The Government charged Defendant Daniel Castro, M.D., with 34 counts of health care fraud in violation of 18 U.S.C. § 1347, and 8 counts of making false statements in relation to health care matters in violation of 18 U.S.C. § 1035.  Castro signed a plea agreement and then entered a guilty plea on one count of making a false statement in relation to health care matters.  Before the Court is Castro's renewed motion to withdraw his plea (ECF No. 198).  For the reasons herein, the Court will deny the motion.

### I. BACKGROUND

**A. Charges**

In the indictment (ECF No. 1), the Government alleges that Castro engaged in various schemes to defraud health care benefit programs.  Counts 1 to 12 allege that he performed functional endoscopic sinus surgeries ("FESS") that were not medically necessary.  Counts 13 to 22 allege that he routinely "upcoded" his procedures, billing for higher-paying FESS procedures that he did not actually perform.  Counts 23 to 26 allege that he billed for FESS procedures involving frontal sinuses when the patients were individuals who did not have frontal sinuses. Counts 27 to 34 allege that he fraudulently billed gland removal and lymph node procedures as a

higher-paying, complex neck procedure for cancer. Counts 35 to 42 allege that Castro made materially false statements about his patients' conditions or about the procedures he performed in connection with the delivery of services and billing for those services.

### B. Withdrawal of Counsel

Castro initially retained attorneys Matthew Borgula and Mikayla Hamilton to represent him. He terminated that relationship in September 2022, causing his attorneys to seek leave to withdraw. The following month, the Court permitted Castro's newly retained counsel, Ronald Chapman, II, and John Cardello, to take over his representation.

### C. Plea Agreement

On March 19, 2023, Castro signed a plea agreement (ECF No. 122) wherein he agreed to plead guilty to one count of making a false statement to a health care insurer, in exchange for the dismissal of the other counts. As the factual basis for his plea, the plea agreement stipulated that Castro had selected a "Current Procedural Terminology Code (CPT Code)" for a procedure he performed on September 20, 2016, but the code did not match the procedure he actually performed. (Plea Agreement ¶ 8.) Although he had performed a simple "excisional node biopsy," he selected the CPT Code for a more complex and higher-paying procedure. (*Id.*) This conduct resulted in the submission of a false insurance claim to the health insurer, who paid the claim. (*Id.*) According to the plea agreement, Castro knowingly used this false statement "in connection with the delivery of or payment for health care services." (*Id.*)

In at least three different sections, the plea agreement noted that conduct alleged in other counts of the indictment would be relevant for Castro's sentence, even though he was not pleading guilty to those counts. For example, the agreement stated:

> Defendant further agrees that the health care fraud schemes alleged in Counts 1 to 34 of the Indictment constitute relevant conduct to his offense of conviction under USSG § 1B1.3 for purposes of sentencing and restitution. Defendant understands

> that the Government will provide factual information to the Probation Officer regarding the conduct underlying counts 1 to 34 that will be included in the Presentence Report and that he cannot object to those facts for purposes of his sentencing, including sentencing loss; however, Defendant may request that the Probation Officer supplement that factual information with additional facts about counts 1 to 34.

(*Id.* ¶ 8.) Elsewhere, it provided that the restitution Castro would have to pay "is not restricted to the amounts alleged in the Indictment to which [he] is pleading guilty. . . . [T]he restitution amount is at least $250,000.00, but . . . the final restitution amount will be determined by the Court at sentencing." (*Id.* ¶ 4.) Later, it stated that, for purposes of calculating the Sentencing Guidelines, the loss attributable to Defendant's conduct exceeded $250,000.00, and "the health care fraud schemes alleged in the Indictment that Defendant agrees constitute relevant conduct for sentencing purposes." (*Id.* ¶ 14(a).)

Castro signed the agreement, affirming that he entered into it "freely, knowingly, and voluntarily[.]" (*Id.* ¶ 22.) He also affirmed that he had read and "carefully discussed every part of" the agreement with his attorney, that he understood it, that he had not been threatened or forced to enter into the agreement, and that he was "satisfied with the representation of [his] attorney in this matter." (*Id.*, PageID.895.)

**D. Castro Emails Former Employer**

About two days after signing the plea agreement, Castro sent an email to his former employer, Bronson Healthcare, urging it to compensate him for the "financial penalty" that he would incur as a result of his conviction. (3/21/2023 Email, ECF No. 127-1, PageID.908.) He stated that, "due to financial hardship, with [his] attorney's advice, [he] had to reach a settlement agreement" with the Government. (*Id.*) Regarding the September 2016 procedure mentioned in the plea agreement, Castro acknowledged removing lymph nodes, but he appeared to minimize his

3

responsibility for submitting a false statement, stating, "Unfortunately, I clicked the wrong CPT code on EPIC[.]" (*Id.*)

Regarding the financial consequences of his conviction, he noted that his financial penalty "will be determined by the judge during sentencing," but it was estimated to be "between $250,000 - $500,000[.]" (*Id.*) He urged Bronson to pay this penalty and his defense costs, arguing that Bronson should "recognize[] [its] responsibility" for his situation, which resulted from "the lack of oversight and the perpetuation of baseless allegations by certain Bronson Healthcare employees." (*Id.*)

On March 29, 2023, the Government informed the Court about this email, arguing that it demonstrated Castro had not accepted acceptance of responsibility. (*See* Govt's Notice Regarding Developments ¶ 3, ECF No. 127.) The Government indicated that it would oppose Castro's request for a reduction in his offense level for acceptance of responsibility.

**E. Plea Hearing**

The Court held a plea hearing on April 3, 2023. At the hearing, the Court asked Castro's attorney, Chapman, whether Castro intended to plead guilty in light of the email he sent to his former employer. Chapman represented that Castro had "panicked" after signing the plea agreement and "wrote a very ill-advised e-mail," but that Castro still intended to plead guilty. (Plea Hr'g Tr. 3, ECF No. 133.) Chapman also represented that Castro was aware that the Government intended to argue that he does not qualify for a reduction of his offense level for acceptance of responsibility. (*Id.* at 4.)

The Court asked the parties whether there had been any agreement on the amount of restitution Castro would be expected to pay, and Chapman represented that they intended to reach an agreement on that issue, but the Government had not yet had the opportunity to review all the patient files that it would use for its calculation. (*Id.* at 5.) The Government reiterated that Counts

4

1 through 34 of the indictment would be considered relevant conduct for purposes of determining restitution, and that its only agreement with Defendant at that time about restitution was that the "floor" would be $250,000; it would attempt to work with Defendant over the next few months "to agree to how much additional financial harm was caused during February of '15 and May of '17 when this scheme that he's admitted to occurred[.]" (*Id.* at 8.)

Castro was then placed under oath. Castro affirmed that he "had the chance to discuss [the plea agreement] thoroughly" with his attorney and that he "had enough time to discuss thoroughly with [his attorney] what [his] situation is, what [his] choices are, and [his] decision to plead guilty[.]" (*Id.* at 13.) Castro affirmed that his attorney was able to answer Castro's questions "to [Castro's] satisfaction" and that Castro was "satisfied overall with the advice and the representation" he had received. (*Id.*) Castro also affirmed that he understood the rights he was waiving by entering his plea as well as the penalties for the offense to which he would be pleading guilty, and that he made his choice to plead guilty "freely and voluntarily," without threats or force from others. (*Id.* at 16-20.)

The Government then highlighted portions of the plea agreement, including Castro's agreement to cooperate with the Government, Castro's agreement to repay Medicare and Medicaid, and Castro's surrender of his medical license. (*Id.* at 22-24.) In particular, as to Castro's obligation to pay restitution, the Government noted that Castro agreed that his obligation would be at least $250,000, but the final amount—to be determined by the Court at his sentencing—would likely be higher. (*Id.* at 22.) The Government also noted that Castro had agreed that his conduct in the counts 1 through 34 of the indictment would be considered "relevant conduct" at sentencing and that he would not contest the factual basis for those counts. (*Id.* at 24.)

5

After the Government's presentation, Castro affirmed under oath that he had read the entire agreement, he understood all its terms, there was nothing in the agreement he did not understand or had questions about, and nothing the Government had said about it surprised him. (*Id.* 26-27.) He also affirmed his understanding that other counts of the indictment would be used to determine the total amount of restitution he would owe. (*Id.* at 27.) And he understood that he had agreed to a "floor" in terms of restitution but that "there's going to be an argument that it's going to be a lot more than that[.]" (*Id.*)

When asked about the factual basis for his plea, Castro testified that he "used the wrong templates" and "entered the wrong CPT" code for a procedure. (*Id.* at 35.) When asked whether he did that "knowingly and willfully in falsifying that code," he agreed that he had. (*Id.* at 35-36.) The Government followed up on Castro's assertion that he "picked the wrong template." The Government asked him whether he "picked that template knowingly and willfully because it contained language that would suggest to the coding department of the hospital that [he] did that procedure," and Castro responded, "I picked the wrong template, yes[.]" (*Id.* at 36-37.) The Court told Castro that he had to "plead guilty because [he] want[ed] to plead guilty because [he was], in fact, guilty." (*Id.* at 37.) Castro responded, "I do plead guilty, Your Honor. I do." (*Id.*) The Court then asked him, "So . . . when you say you picked the wrong template, you picked a template that stated something that you knew was not correct." (*Id.* at 37.) Castro said, "Yes, Your Honor." (*Id.*) To drive the point home, the Government asked him, "[Y]ou did that because you wanted it to look like you did the neck dissection procedure when you knew that you didn't, right?" (*Id.* at 38.) Castro responded, "Correct." (*Id.*)

The Court further explained:

Dr. Castro, here's why I ask the questions that I ask. I want you to fully know what you're doing. I want you to come in here, tell me what you did, because what I

6

> don't want to happen is a week later or months down the line, I don't want you coming back to me and saying you didn't understand that your plea meant certain things or that it had certain consequences or ramifications.

(*Id.*)  With that explanation, the Court asked him, "You fully understand and know what you plead guilty to; is that correct?" (*Id.*)  Castro said, "I do understand, Your Honor." (*Id.*)  Finally, the Court asked Castro whether he had "reservations about proceeding and going forward and [the Court] accepting the plea," and he responded, "No, Your Honor." (*Id.* at 39.)  The Court accepted his plea.

### F. Second Withdrawal of Counsel

In August 2023, Castro's attorneys, Chapman and Cardello, filed a motion to withdraw as counsel because communication with Castro had "broken down" and Castro told them that he was terminating their legal representation. (Mot. to Withdraw as Att'y ¶¶ 3-4, ECF No. 147.)  At a hearing on August 21, 2023, the Court granted counsel's motion to withdraw.

### G. Castro's First Motion to Withdraw His Plea

At the hearing on August 21, Castro asked to withdraw his plea.  The Court instructed him to file a request in writing.  On September 8, 2023, Castro filed a pro se motion to withdraw his guilty plea.  The Government responded to Castro's motion and Castro filed a reply.  The Court subsequently appointed attorney Parker Douglas to represent him.

In his motion, Castro contended that he entered his plea under the assumption that Chapman had adequately prepared for trial, but he later discovered that was not the case due to Chapman's "preoccupation with other cases," which purportedly led Chapman to pressure Castro into pleading guilty.  (Mot. to Withdraw Plea 2, ECF No. 157.)  Castro also asserted that he had signed the plea agreement "under immense distress," with "a mere 24-hour window" to sign it.  (*Id.* at 3.)  He contended that he was not informed of the full consequences of his plea, including "potential lifetime incarceration and subsequent forfeiture of his professional vocation, reputation,

7

continued vulnerability to lawsuits, travel restrictions, and the loss of his right to vote." (*Id.* at 4.) He also believed that Bronson had failed to provide exculpatory evidence.

### H. Castro's Pro Se Objections to Relevant Conduct and Restitution

In early September, shortly before he filed his written motion to withdraw his plea, he sent the Court objections to the description of his conduct in the initial presentence investigation report ("PSR"), focusing on the procedures that were part of the relevant conduct in counts 1 to 34 of the indictment. (Pro Se Objections, ECF No. 170.) At the time, the PSR estimated that the financial loss attributable to Castro was approximately $796,000. (PSR ¶ 61, ECF No. 150.) In mid-October, Castro filed pro se objections to the prosecutor's restitution calculations. (ECF No. 179.)

### I. Court Denies Motion to Withdraw Plea

The Court denied Castro's motion to withdraw his plea on November 8, 2023, noting the inconsistencies between his assertions of duress and ignorance and the factual record, including his representations under oath at his plea hearing. That record demonstrated that he had received ample time to consider the plea agreement and that he made the decision to plead guilty voluntarily and with full knowledge of the relevant consequences. And after weighing the relevant factors, the Court concluded that Castro had not established a fair and just reason for withdrawal of his plea.

### J. Castro's Renewed Motion to Withdraw his Plea

Castro filed a renewed motion to withdraw his guilty plea on January 30, 2024. The renewed motion raises new concerns. Castro now contends that Chapman did not read through the plea agreement with him paragraph-by-paragraph, did not adequately explain to him the "relevant conduct" provisions of the plea agreement, and was not able to "adequately" answer Castro's questions about changing his plea. (Renewed Mot. to Withdraw Plea 2, ECF No. 199.)

8

Chapman purportedly told Castro that if he did not respond "yes" to the Court's questions, Castro would go to prison for the rest of his life. (*Id.* at 5.)

### 1. Hamlett Declaration

The motion is supported by a declaration[1] from Castro's daughter, Krystin Hamlett, who avers that she was present during meetings between Castro, the Government, and Castro's previous defense counsel. She contends that Chapman did not mention the concepts of "relevant conduct" or "restitution," but he did mention "financial penalties with a floor of approximately $250,000." (Hamlett Decl. ¶¶ 12, 20, ECF No. 199-1.) Chapman's discussions with Castro about the plea agreement were brief and Chapman seemed "anxious and increasingly agitated." (*Id.* ¶¶ 16-17.) Chapman was apparently angry with Castro after Castro emailed Bronson; he did not return Castro's calls for two days. Chapman told Castro that "if he did not say 'yes' at the change of plea hearing to everything the judge asked him he would go directly to trial and spend the rest of his life in prison." (*Id.* ¶ 24.)

### 2. Borgula Affidavit

Castro has waived his right to attorney-client privilege and his previous attorneys have filed affidavits providing their accounts of their representation of him. According to Borgula, Borgula's firm spent approximately 748 hours on Castro's case. (Borgula Aff. ¶ 3, ECF No. 214.) After meeting with the Government's attorney in July 2022, Castro told Borgula that he did not wish to proceed to trial, but he was not prepared to plead guilty. (*Id.* ¶ 4.) Borgula received a written plea agreement from the Government in August 2022. That agreement was similar to the one Castro ultimately signed in that it required Castro to plead guilty to one count but stipulated that dismissed counts would be considered relevant conduct for purposes of sentencing. (*Id.* ¶ 5.)

---

[1] The declaration is not properly sworn, but that defect makes no difference to the Court's analysis or to the outcome.

9

That same month, Borgula provided a copy of this agreement to Castro and went over its terms with him. (*Id.* ¶ 6.) Borgula advised that such a plea would cap his sentence at 60 months, but if Castro went to trial and lost, he would likely face a Sentencing Guidelines range of 121 to 151 months of imprisonment. (*Id.* ¶ 7.) The following month, Borgula discussed with Castro the strengths and weaknesses of his case and the possible outcomes should the case proceed to trial or resolve pursuant to a plea agreement. (*Id.* ¶ 9.) Borgula told Castro that his opinion of the likelihood of success at trial had "gone down" as they prepared for trial. (*Id.* ¶ 8.) Castro decided to retain new counsel, so Borgula withdrew from the case.

### 3. Chapman Affidavit

Chapman avers that Castro retained him as his replacement counsel at the end of September 2022. (Chapman Aff. ¶ 3, ECF No. 216.) Chapman's team prepared a presentation of "all relevant portions of the Government's case," including "Castro's medical records, claims data, portions of the indictment, primary care records, and witness statements." (*Id.* ¶ 9.) After the Court granted several of the Government's motions in limine, Castro decided to renew plea negotiations, so Chapman asked the Government to revive its plea offer. (*Id.* ¶ 10.) The Government offered a plea deal substantially similar to the one Castro later signed. In particular, Castro would plead guilty to one count of submitting false medical records in exchange for dismissal of the other counts, some of which would be considered relevant conduct for sentencing and restitution. (*Id.* ¶¶ 11, 17.) Chapman advised Castro that, due to his age (72 years old), a sentence near the ten-year maximum for healthcare fraud would likely mean that Castro would spend the rest of his life in prison. (*Id.* ¶ 15.)

Chapman did not use legal jargon like "relevant conduct" in his discussions with Castro, but he did explain to Castro and Hamlett that the plea agreement provided that the conduct in counts 1 through 34 of the indictment would count for purposes of calculating the sentencing

10

guidelines, restitution, and sentencing loss. (*Id.* ¶ 17.) Chapman explained to Castro that the Government was only willing to allow Castro to plead guilty to a felony with a five-year term if Castro agreed that counts 1 through 34 would be relevant conduct. (*Id.*) Castro had concerns about not being able to contest that conduct, so Chapman was able to negotiate adding an additional sentence to the plea agreement providing that Castro could give the probation officer additional facts about the dismissed counts. (*Id.*) The Government sent a copy of the revised agreement to Chapman on March 18, 2023. (*Id.* ¶ 18.)

Castro also had concerns about the forfeiture money judgment provisions of the plea agreement. The initial agreement from the Government provided that the forfeiture money judgment would be $748,885.84, but Castro and Chapman determined that this amount was too high because it was based on all sinus procedures performed by Castro, rather than the procedures at issue in the indictment. (*Id.* ¶ 21.) Consequently, Chapman was able to reduce the forfeiture provision to $13,573.59, which would be the floor for a calculation based on the counts of the indictment. (*Id.*) That provision provides:

> Defendant agrees at this time that the calculation of proceeds he received from the specific executions of the healthcare fraud schemes alleged in counts 1 to 34 of the Indictment is $13,573.59, which represents the floor of any forfeiture money judgment. However, Defendant understands and agrees that the Government will be determining the amount of proceeds he received from the entire scheme to defraud between February 2015 and May 2017, not just the executions charged in the Indictment.

(Plea Agreement ¶ 7.)

Chapman discussed the final agreement with Castro, who agreed to sign it on the evening of March 19, 2023; Castro then signed it the following day. (Chapman Aff. ¶ 22.)

### 4. Castro Affidavit

Castro submitted an affidavit in his reply in support of his motion. He acknowledges that Borgula read him a copy of the initial plea agreement, but Castro contends that Borgula "never

explained the legal meaning of anything" in that agreement. (Castro Aff. ¶ 8, ECF No. 225-1.) Castro contends that he immediately rejected the plea offer at that time. (*Id.*) Castro asserts that he ended his attorney-client relationship with Borgula because Borgula was not "in any way prepared or preparing for trial." (*Id.* ¶ 10.)

Castro contends that Chapman's trial presentation was "useless and poorly done," and it showed that Chapman was not prepared for trial. (*Id.* ¶ 16.) Castro asserts that, in the days leading up to the plea agreement, Castro continually insisted that he wanted to go to trial, but it became "clearer and clearer" to him that Chapman was "incapable" of doing so. (*Id.* ¶ 18.) Chapman "seemed leery of trial and strenuously pressed a change of plea." (*Id.*)

In Castro's meetings with Chapman on March 16 and 19, Chapman "never mention[ed] the concept of 'relevant conduct[.]'" (*Id.* ¶ 19.) To the extent Chapman discussed financial penalties, he "mention[ed] numbers between $100,000 and $250,000" and "essentially promised that he could convince the government to agree with numbers between 100,000 and 150,000." (*Id.*) According to Castro, Chapman did not "thoroughly review" the plea agreement with Castro or meaningfully explain it to him. (*Id.* ¶ 22.) Instead, Chapman "pressured [him] again and again," "threatening life in prison" if Castro did not sign the plea agreement. (*Id.* ¶ 21.)

On March 24, five days after Castro signed the plea agreement, Chapman told Castro that he estimated the financial penalty would be between $250,000 and $750,000. (*Id.* ¶ 25.) When Chapman prepared Castro for the plea hearing, Chapman purportedly told Castro that, "unless [Castro] was agreeable and answered yes [Castro] would likely go to jail for the rest of [his] life." (*Id.* ¶ 29.) Specifically, Chapman told Castro to answer "'Yes, your Honor' to each question." (*Id.*)

12

## II. ANALYSIS

"A district court may permit a defendant to withdraw a valid guilty plea if the defendant presents the court with a 'fair and just reason for requesting the withdrawal.'" *United States v. Tapia*, No. 22-5226, 2023 WL 2034125, at *5 (6th Cir. Feb. 16, 2023) (quoting Fed. R. Crim. P. 11(d)(2)(B)). The "purpose" of this rule is

> to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty.

*Id.* (quoting *United States v. Alexander*, 948 F.2d 1002, 1004 (6th Cir. 1991)) (internal quotation marks omitted); *see United States v. Sydnor*, 762 F. App'x 284, 288 (6th Cir. 2019) ("The idea behind Rule 11 is to provide a rare remedy for 'real confusion or misunderstanding' about the plea agreement, not for buyer's remorse." (quoting *United States v. Ellis*, 470 F.3d 275, 281 (6th Cir. 2006))). "When a defendant has entered a knowing and voluntary plea of guilty at a hearing at which he acknowledged committing the crime, the occasion for setting aside a guilty plea should seldom arise." *Ellis*, 470 F.3d at 280 (quoting *United States v. Morrison*, 967 F.2d 264, 268 (8th Cir. 1992)).

Castro "bears the burden of proving that he is entitled to withdraw his guilty plea." *Id.* The Court considers the following "non-exclusive, non-controlling" factors when determining whether there is a "fair and just reason" for withdrawal of the plea:

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

13

*Tapia*, 2023 WL 2034125, at *5 (quoting *United States v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994)).

### A. Length of Time Between Plea and Motion to Withdraw Plea

"The shorter the delay [between the plea and the motion to withdraw the plea], the more likely a motion to withdraw will be granted, and a defendant's reasons for filing such a motion will be more closely scrutinized when he has delayed his motion for a substantial length of time." *United States v. Baez*, 87 F.3d 805, 808 (6th Cir. 1996).

Castro initially asked to withdraw his plea over four months after his plea hearing. His renewed motion comes nine months after that hearing, and two months after the Court denied his first motion. The Court of Appeals has found that shorter lengths of time favor the Government. *See, e.g.*, *United States v. Carson*, 32 F.4th 615, 624 (6th Cir. 2022) (59 days); *United States v. Catchings*, 708 F.3d 710, 718 (6th Cir. 2013) (two months); *United States v. Martin*, 668 F.3d 787, 795 (6th Cir. 2012) (95 days). Thus, this factor favors the Government.

### B. Reason for Delay

As reason for the delay, Castro argues that Chapman would not speak to him for several days after he sent his email to Bronson, and that his relationship with Chapman was "shaky" even after he entered his plea. But that shaky relationship did not stop Chapman from discussing the plea agreement with Castro before the plea hearing (after Castro sent the email to Bronson) and then representing him at the hearing. Castro does not contend that Chapman refused to communicate with him after that hearing, or that Castro ever asked Chapman to move to withdraw the plea and that Chapman would not do so. Thus, Castro does not adequately explain why he did not seek to withdraw his plea until about four months after the plea hearing. Nor does he explain why he waited another two months after the Court denied his first motion to withdraw the plea to raise the concerns that he raises now. In summary, this factor favors the Government.

### C. Assertion of Innocence

"A defendant's 'vigorous and repeated protestations of innocence' may support the decision to allow withdrawal of a guilty plea." *Carson*, 32 F.4th at 624 (quoting *United States v. Carpenter*, 554 F. App'x 477, 482 (6th Cir. 2014)). "However, claims of innocence are not convincing when the defendant has vacillated over time." *Carpenter*, 554 F. App'x at 482.

As the Court explained in its previous opinion, Castro has not been consistent in asserting his innocence. He admitted the facts supporting the charge against him in his written plea agreement and at the plea hearing. True, he has at times shown reluctance to admit full responsibility for making a false statement, but his vacillation undermines his assertion of innocence. *See Carson*, 32 F.4th at 624 (weighing this factor against a defendant who "made a knowing and voluntary guilty plea" and who "specifically acknowledged as true the plea agreement's statement of facts"). Moreover, Castro's primary concern appears to be the financial consequences of his plea, rather than his factual innocence. That financial concern motivated his email to Bronson, in which he argued that he had to reach a settlement with the Government for financial reasons and that Bronson should pay his financial penalty. The same concern is also a prominent focus of his and his daughter's statements. (*See* Hamlett Decl. ¶ 13 ("Mr. Chapman did not mention relevant conduct or that financial penalties consequent to changing a plea could be anywhere over $1 million."); Castro Aff. ¶¶ 19, 21, 23, 25-27, 29 (discussing Chapman's representations regarding the financial penalties).) As before, this factor favors the Government.

### D. Circumstances Underlying Entry of Guilty Plea

The circumstances underlying the guilty plea do not favor Castro. Although he now contends that Chapman provided ineffective assistance of counsel by not reading through or explaining the entire plea agreement to him, Castro stated otherwise in the plea agreement itself. Castro also affirmed under oath at his plea hearing that he had read through the entire agreement,

15

that he understood it, that nothing the Government said about the agreement in its presentation surprised him, that he had ample time to discuss the agreement with his attorney, and that he was satisfied with his counsel's representation of him. Castro also repeatedly affirmed his choice to plead guilty and acknowledged that his choice was willful and knowing. At no point did he express any dissatisfaction with counsel or any reservations about pleading guilty. To the contrary, he expressly denied having such reservations. "A defendant's statements at a plea hearing should be regarded as conclusive [as to truth and accuracy] in the absence of a believable, valid reason justifying a departure from the apparent truth of those statements." *United States v. Dennis*, No. 22-3023, 2022 WL 17348383, at *3 (6th Cir. Dec. 1, 2022) (quoting *United States v. Goodloe*, 393 F. App'x 250, 255 (6th Cir. 2010)). Castro has not provided a believable, valid reason for disregarding the apparent truth of his plea hearing testimony.

Likewise, the record undermines Castro's contention that he did not understand the relevant conduct provisions of the plea agreement or the financial consequences of pleading guilty. The provisions discussing relevant conduct are clearly set forth in the plea agreement and were specifically discussed at the plea hearing, where Castro expressly acknowledged his understanding of these provisions. Although Castro now contends that, in the days before he signed the plea agreement, Chapman told Castro his financial penalty would only be between $100,000 and $250,000 (Castro Aff. ¶ 19), Castro accurately asserted in his email to Bronson that his financial penalty was estimated to be between $250,000 and $500,000, and he pointed out that the Court would make a final determination of the amount at his sentencing. Also, as Castro acknowledges, on March 24, more than a week before the plea hearing, Chapman told him that the financial penalty could be between $250,000 and $750,000. (Castro Aff. ¶ 25.) Thus, when Castro entered

16

his plea before the Court, he understood the relevant conduct provisions and the financial consequences of his guilty plea. His assertions to the contrary are not credible.

Similarly, Castro's contention that he pleaded guilty because he was concerned about Chapman's lack of preparedness for trial flies in the face of his repeated representations in the plea agreement and in his sworn testimony that he was satisfied with the representation he had received from Chapman and that he was willing to plead guilty. Castro contends that the Court should discount his hearing testimony because he was simply following Chapman's instruction to answer "yes" to the Court's questions, but Castro clearly understood that the reason for such an instruction was to ensure that Castro could proceed with his guilty plea. If Castro did not wish to proceed, he could have said so. And if he was not satisfied with counsel's conduct, he could have said so. Castro is knowledgeable and sophisticated enough to understand the importance of telling the truth while under oath in the courtroom. He is also confident enough to terminate his hired attorneys when he is dissatisfied with them, as he did with Borgula and later with Chapman and Cardello. But here, he chose to proceed. It is not logical that he would do so while dissatisfied with counsel's assistance. Thus, for all the foregoing reasons, the record undermines his assertion that he was concerned about counsel's preparedness for trial.

Castro also contends that Chapman pressured him to plead guilty by threatening that Castro would go to prison for the rest of his life if he went to trial; however, Chapman explains that he said this while referring to Castro's age. Similarly, Borgula explained to Castro that he faced a guidelines range of approximately 120 to 150 months if he went to trial. A ten-year sentence for someone of Castro's age would potentially put him in prison for the rest of his life. That is the sort of consequence someone in Castro's position should know when deciding whether to plead guilty or proceed to trial. In other words, Chapman's warning made Castro's plea more voluntary,

17

not less.  Also, Castro affirmed at his plea hearing that his decision to plead guilty was taken freely and voluntarily; he denied that anyone forced him to plead guilty or made threats to get him to do so.  (Plea Hr'g Tr. 20.)  Thus, his plea hearing testimony contradicts his assertion that he pleaded guilty because of threats or pressure from Chapman.

In short, the record refutes Castro's contentions that Chapman provided ineffective assistance, or that any conduct by Chapman undermined the validity of Castro's plea.  *See Hill v. Lockhart*, 474 U.S. 52, 56 (1985) ("The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970))).  This factor weighs in the Government's favor.

### E. Defendant's Nature and Background

Defendant is a former medical doctor who is well educated and was capable of understanding all the consequences of his decision to plead guilty.  This factor favors the Government.

### F. Prior Experience with the Criminal Justice System

It appears that Castro has no prior experience with the criminal justice system, which weighs in his favor.

### G. Potential Prejudice to the Government

Castro argues that it may be easier to proceed to trial at this stage due to Castro's many disagreements with the presentencing report.  Castro asserts that there is no obvious prejudice to the Government, and the Government does not address the issue in its response brief.  This factor favors Castro.

## III. CONCLUSION

After considering and weighing all the facts, the Court finds that Castro has not provided a fair and just reason for withdrawal of his plea. Accordingly, the Court will deny his motion.

The Court will enter an order consistent with this Opinion.


Dated: April 3, 2024                                  /s/ Hala Y. Jarbou
                                                     HALA Y. JARBOU
                                                     CHIEF UNITED STATES DISTRICT JUDGE